**FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
\* DECEMBER 04, 2024 \*
BROOKLYN OFFICE**

DMP:JAM
F. #2024R00303

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

NATALYA IVANOVNA MAZULINA,
    also known as "Natasha Mazulina,"

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GRAND JURY CHARGES:

I N D I C T M E N T

Cr. No. _____**24-CR-493**_____
(T. 13, U.S.C., § 305; T. 18, U.S.C.,
§§ 371, 554(a), 981(a)(1)(C), 982(a)(1),
982(b)(1), 1956(h), 2 and 3551 et seq.;
T. 21, U.S.C., § 853(p); T. 28, U.S.C.,
§ 2461(c); T. 50, U.S.C., §§ 4819(a),
4819(b), 4819(d)(1) and 4819(d)(2);
T. 15, C.F.R., §§ 30.71, 736.2(b) and
746)

**Judge Eric R. Komitee
Magistrate Judge Lara E. Eshkenazi**

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.    <u>The Defendant and Relevant Entities</u>

        1.    The defendant NATALYA IVANOVNA MAZULINA, also known as

"Natasha Mazulina," was a naturalized U.S. citizen who lived in the Seattle, Washington

area.  MAZULINA was the Western Regional Manager of a freight forwarding company

based in the Eastern District of New York (the "U.S. Freight Forwarder").  As the Western

Regional Manager, MAZULINA was responsible for the U.S. Freight Forwarder's business

in the western region of the United States.

        2.    The U.S. Freight Forwarder, an entity the identity of which is known to

the Grand Jury, was an international freight forwarding company based in Jamaica, New

York, that provided air freight, ocean freight, warehouse and storage, and ground

transportation services.   The U.S. Freight Forwarder was created in approximately October 2000 under the laws of the State of New York.   The U.S. Freight Forwarder had locations at John F. Kennedy International Airport in the Eastern District of New York and Seattle-Tacoma International Airport in Washington.   The U.S. Freight Forwarder marketed itself as a part of a global network of logistics companies that provided logistics and supply chain solutions to customers around the world.

3.      The "Russian Freight Forwarder," an entity the identity of which is known to the Grand Jury, was a freight forwarding and cargo company based in St. Petersburg, Russia.   The Russian Freight Forwarder marketed itself as a general sales agent in the international air transportation market and claimed to operate at ten different international airports in Russia.   General sales agents typically worked with airlines to market and sell cargo space on their aircraft to customers that wanted to move goods.   The Russian Freight Forwarder was related to a larger Emirati global air cargo transportation company that marketed itself as primarily servicing Turkey, the United Arab Emirates ("UAE"), China, and Hong Kong.

4.      The "Turkish Freight Company," an entity the identity of which is known to the Grand Jury, was affiliated with the Russian Freight Forwarder and the larger Emirati global air cargo transportation company.   The Turkish Freight Company facilitated some of the transactions between the Russian Freight Forwarder and the U.S. Freight Forwarder through the Turkish Freight Company's Turkish bank account.

5.      The "Russian Gas Company," an entity the identity of which is known to the Grand Jury, was an oil and gas production and engineering company located in Moscow, Russia.   The Russian Gas Company specialized in natural gas compression,

treatment, and processing and its customers included oil and gas companies owned by the Government of Russia.   In marketing materials, the Russian Gas Company trumpeted its work for the Russian military-industrial complex and Russian power plants.

6.     The "Hong Kong Company," an entity the identity of which is known to the Grand Jury, was affiliated with the Russian Gas Company and was used by the Russian Gas Company to transship items from the United States to Russia.

II.     Relevant Statutory and Regulatory Background

A.     The Export Control Reform Act and Export Administration Regulations

7.     The Export Control Reform Act ("ECRA") provided that "the national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items, and specified activities of United States persons, wherever located, be controlled" for various purposes.   50 U.S.C. § 4811.   ECRA granted the President of the United States the authority to control, inter alia, the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or foreign persons.   Id. at § 4812.

8.     The United States Secretary of Commerce was granted the authority to establish ECRA's applicable regulatory framework.   Id.   Pursuant to that authority, the Department of Commerce, through the Bureau of Industry and Security ("BIS"), reviewed and controlled the export of certain items, including goods, software, and technologies, from the United States to foreign countries through the Export Administration Regulations ("EAR").   The EAR restricted the export of items that could contribute to the military potential of other nations or that could be detrimental to United States foreign policy or national security.   The EAR imposed licensing and other requirements for certain items to

be lawfully exported from the United States or lawfully re-exported from one foreign destination to another.

9.    On February 24, 2022, in response to Russia's invasion of Ukraine, BIS imposed new license requirements on exports and re-exports to Russia.   On March 3, 2022, BIS imposed additional license requirements for exports, reexports, and transfers to or within Russia of any items subject to the EAR that were identified under certain Schedule B or Harmonized Tariff Schedule ("HTS") codes.   See 87 Fed. Reg. 12856 (March 8, 2022); 15 C.F.R. Part 746, Supp. No. 4.   HTS codes took their first six digits from the corresponding Harmonized System ("HS") code, which was a standardized numerical method of classifying traded products that was used by customs authorities around the world.

10.    Since March 2022, BIS has gradually restricted additional items from export or reexport to Russia using the Russian Industry Sector Sanctions.   See 15 C.F.R. § 746.8.   The additional export controls targeted Russia's military-industrial base and included items related to the Russian oil and gas refinery and production, aviation, and aerospace industries; commercial and industrial operations; electronics and navigational equipment; industrial machinery, lubricants, and metals; software; and chemical and biological precursors.   BIS's Russian Industry Sector Sanctions further limited Russia's access to items of potential military significance and expanded the economic impact of controls that denied Russia additional resources it needed to continue waging war.

11.    It was unlawful for any person to violate, attempt to violate, conspire to violate, or cause a violation of ECRA's provisions or any regulation, order, license, or other authorization issued under ECRA.   50 U.S.C. § 4819.   ECRA prohibited, inter alia, ordering, buying, selling, and transporting items to be exported from the United States with

knowledge that such conduct was a violation of ECRA (§ 4819(a)(2)(E)); making any false

or misleading representation and/or falsifying or concealing any material fact to an official of

the United States in the course of any action subject to the EAR (§ 4819(a)(2)(F)); engaging

in any transaction or taking any other action with "intent to evade the provisions of this title,

the Export Administration Regulations, or any order, license, or authorization issued

thereunder" (§ 4819(a)(2)(G)); and failing or refusing to comply with associated reporting or

recordkeeping requirements (§ 4819(a)(2)(H)).

      B.    <u>The Automated Export System and Electronic Export Information</u>

         12.    Pursuant to U.S. law and regulations, exporters or their authorized

agents, such as shippers or freight forwarders, were required to file certain forms and

declarations concerning the export of goods and technology from the United States.

Typically, those documents were filed electronically through the Automated Export System

("AES"), which was administered by federal agencies with responsibilities concerning

commerce and export controls.

         13.    The Electronic Export Information ("EEI") (formerly known as the

Shipper's Export Declaration) was the required documentation submitted to the U.S.

Government through AES in connection with an export shipment from the United States.

Exporters or their authorized agents were required to file an accurate and truthful EEI for

each export of goods from the United States with a value of $2,500 or more.   An EEI also

was required regardless of the value of the goods if the goods required an export license.   15

C.F.R. §§ 758.1, 30.2.

         14.    A material part of the EEI and AES, as well as other export filings, was

information concerning the end user and ultimate destination of the export.   The identity of

the end user may determine whether goods: (a) may be exported without any specific

authorization or license from the U.S. Government; (b) may be exported with the specific

authorization or license from the U.S. Government; or (c) may not be exported from the

United States.

15.     The purpose of these requirements was to strengthen the U.S.

Government's ability to prevent the export of certain items to unauthorized destinations and

end users because the EEI and AES aided in targeting, identifying, and, when necessary,

confiscating suspicious or illegal shipments before exportation.   15 C.F.R. § 30.1(b).

16.     A freight forwarder, or forwarding agent, was defined under the

applicable regulations as the "person in the United States who is authorized by the principal

party in interest to facilitate the movement of the cargo from the United States to the foreign

destination and/or prepare and file the required documentation."   Id. at § 30.1(c).

III.     Overview of the Criminal Scheme

17.     From in or about at least December 2022 through December 2024,

within the Eastern District of New York and elsewhere, the defendant NATALYA

IVANOVNA MAZULINA conspired with others, including Russian freight forwarding

companies, to facilitate the unlawful supply of goods from the United States to Russia in

violation of U.S. export laws and regulations.   MAZULINA and her co-conspirators used a

network of overseas front companies, transshippers, and bank accounts to ship export-

controlled goods from the United States to intermediary countries with the knowledge and

intention that the goods would be exported from the United States to Russia through those

intermediary countries.

18.    In furtherance of the conspiracy, the defendant NATALYA IVANOVNA MAZULINA knowingly filed, and caused to be filed, false export documents with the U.S. Government, and instructed and advised her co-conspirators, including Russian freight forwarding companies, on how to falsify export documents and business records to avoid U.S. Government scrutiny.

A.    Facilitating the Export of Oil and Gas Equipment to Russia

19.    The defendant NATALYA IVANOVNA MAZULINA and her co-conspirators unlawfully procured, transported, and shipped, from the Eastern District of New York and elsewhere, goods from the United States, such as oil and gas compression and flow measurement equipment, to Russian end users, including a company that promoted its work for oil and gas projects in Russia and customers in the Russian military-industrial base.   As part of the scheme, MAZULINA regularly told her co-conspirators to remove any reference to Russia from business records and export documents.

20.    One of the Russian procurement networks that the defendant NATALYA IVANOVNA MAZULINA frequently worked with procured goods from the United States for the Russian Gas Company.   When arranging for U.S. exports, the Russian Gas Company frequently worked through the Hong Kong Company.   Before Russia's February 2022 invasion of Ukraine, many of the EEIs that were filed for exports to the Russian Gas Company identified both the Russian Gas Company and the Hong Kong Company as connected to each transaction, and declared Russia as the country of ultimate destination.   According to U.S. export records, the U.S. Freight Forwarder did not facilitate any of the pre-February 2022 declared exports to the Russian Gas Company.   Instead, most of those exports were handled by larger, publicly traded global shipping companies.

21.    After Russia's February 2022 invasion of Ukraine and the expanded export restrictions and sanctions that the U.S. Government imposed on Russia, the Russian Gas Company began almost exclusively using the U.S. Freight Forwarder to export goods from the United States.   After February 2022, none of the EEIs filed by the U.S. Freight Forwarder and related to the Russian Gas Company either identified the Russian Gas Company as the ultimate consignee, or identified Russia as the country of ultimate destination.   Instead, the EEIs identified another intermediary company, such as the Hong Kong Company, as the ultimate consignee and another intermediary country, like China, as the ultimate destination.

22.    For many of these exports for the Russian Gas Company, the defendant NATALYA IVANOVNA MAZULINA worked with co-conspirators at the Russian Freight Forwarder.   On numerous occasions, the Russian Freight Forwarder notified MAZULINA that a shipment was being prepared in the U.S. and requested that MAZULINA facilitate the movement and export of the goods destined for the Russian Gas Company.   Specifically, the Russian Freight Forwarder advised that MAZULINA needed to start working with the U.S. supplier or suppliers to arrange for transportation in the U.S. and export from the U.S. to an intermediary country from which the cargo would then be transported to Russia.

23.    For example, on or about March 30, 2023, an employee of the Russian Freight Forwarder emailed the defendant NATALYA IVANOVNA MAZULINA and told her that cargo from two U.S. oil and gas part resellers was ready for pickup and onward shipment to Russia.[1]   The Russian Freight Forwarder employee told MAZULINA that the

---

[1] A portion of this email, and other quoted language contained in this Indictment, were originally written in Russian and have been translated into English.

parts would be exported to Moscow via either the Maldives or Sri Lanka for the Russian Gas Company.   The Russian Freight Forwarder employee then asked MAZULINA whether the cargo from the two U.S. suppliers could be consolidated for export to Russia.

24.   On or about April 16, 2023, the defendant NATALYA IVANOVNA MAZULINA filed an EEI with the U.S. Government for each of these two shipments for the Russian Gas Company.   One EEI falsely listed the ultimate consignee as the Hong Kong Company and the country of ultimate destination as China.   The other EEI falsely listed the ultimate consignee as a company in Sri Lanka and the country of ultimate destination as Sri Lanka.   These EEIs contained materially false statements because MAZULINA knew that the goods were ultimately destined for end users in Russia.

25.   On or about April 21, 2023, shortly after arriving in Sri Lanka, the goods, consolidated as a single shipment, were shipped onward to the Russian Gas Company in Moscow, Russia.   The Russian Gas Company addressee in Moscow had the same name as the person who communicated with the U.S. suppliers using an email account ostensibly associated with the Hong Kong Company.

26.   Moreover, some of the oil and gas parts contained in the April 16, 2023 exports were classified under HTS code 902519.   Both EEIs claimed that no export license was required, even though during this time period, an export license from the Commerce Department was required to export or reexport goods with HTS code 902519 from the United States to Russia.   At no time did the defendant NATALYA IVANOVNA MAZULINA or the U.S. Freight Forwarder have the required licenses to export or reexport these goods to Russia.

27.     On another occasion, in or about May 2023, the defendant NATALYA IVANOVNA MAZULINA corresponded with the Russian Freight Forwarder and others about another shipment of oil and gas parts from U.S. suppliers to the Russian Gas Company. The subject line of one of the email exchanges was "[Russian Gas Company] Order," evidencing that the Russian Gas Company was the true customer behind the transaction. Similar to the April 16, 2023 exports, MAZULINA and her co-conspirators used a company in Sri Lanka to transship the goods to Russia.   On or about May 7, 2023, MAZULINA exported the goods from the United States to Sri Lanka.   On the EEI that MAZULINA filed, the Hong Kong Company was falsely listed as the ultimate consignee and China was falsely listed as the country of ultimate destination.   The oil and gas parts contained in this shipment were classified under HTS code 902610.   At the time, items under HTS code 902610 required a Commerce Department license to be exported or reexported to Russia.

28.     On or about May 19, 2023, shortly after arriving in Sri Lanka, the goods were reexported to the Russian Gas Company in Russia.   The Russian Freight Forwarder was listed in the shipping records as the freight forwarder responsible for the Sri Lanka-to-Russia portion of the shipment.   At no time did the defendant NATALYA IVANOVNA MAZULINA or the U.S. Freight Forwarder have the required license to export or reexport these goods to Russia.

B.     Submitting False Export Documents to the U.S. Government

29.     The defendant NATALYA IVANOVNA MAZULINA and her co-conspirators also falsified export documents, and submitted, and caused to be submitted, false EEIs to the U.S. Government.   The EEIs contained multiple false statements and misrepresentations, including false information about the ultimate consignees and countries

of ultimate destination. For example, on or about December 21, 2022, MAZULINA filed an EEI with the U.S. Government for a shipment of oil and gas parts from the U.S. The EEI claimed that the parts were ultimately destined for a company in Uzbekistan and that the Hong Kong Company was the intermediary consignee. The business records associated with this shipment, however, showed that the parts were intended to be used on oil and gas projects in Russia. Moreover, the Russian Freight Forwarder worked with MAZULINA to arrange and pay for the export. As MAZULINA knew, the Russian Freight Forwarder was regularly used by Russian companies, including the Russian Gas Company, to procure goods from the United States for export to Russia.

30. In other instances, the defendant NATALYA IVANOVNA MAZULINA advised other companies on how to circumvent U.S. export controls and falsify the shipping and business records so that shipments would not be stopped by U.S. law enforcement. For example, in December 2022, another employee of the U.S. Freight Forwarder emailed MAZULINA a description of new Russia-related export restrictions that one of the U.S. Freight Forwarder's partner cargo airlines had sent to the U.S. Freight Forwarder. The U.S. Freight Forwarder employee told MAZULINA, "No Maldives for Russian customer or similar scheme." Shortly after receiving this email, MAZULINA warned an employee of an aircraft parts reseller that was transshipping export-controlled items from the U.S. to Russia, that "there is attention for any MALDIVES shipment from CUSTOMS BORDER PROTECTION OF USA."

31. On another occasion, on or about May 31, 2023, the Russian Freight Forwarder asked the defendant NATALYA IVANOVNA MAZULINA whether she could export a shipment of goods for a customer other than the Russian Gas Company that

contained goods classified under HTS codes that had been "subject to restrictions as of May

19." (On May 19, 2023, BIS announced the expansion of the Russian Industry Sector

Sanctions and the addition of dozens of HTS codes to the export restrictions imposed on

Russia.)   MAZULINA told the Russian Freight Forwarder that the Russian end user had two

options: the U.S. supplier could apply for a license to export the goods or the parties to the

transaction could change the recipient country on the export paperwork from Russia to an

intermediary country and then the Russian Freight Forwarder could pick the cargo up from

that intermediary country and deliver the cargo to Russia.

     C.   <u>Money Laundering</u>

     32.    In furtherance of their criminal conduct, the defendant NATALYA

IVANOVNA MAZULINA and her co-conspirators used a variety of methods to receive

illicit payments, including a network of front corporations with bank accounts in various

jurisdictions.

     33.    For example, on or about March 6, 2023, the Russian Freight

Forwarder told the defendant NATALYA IVANOVNA MAZULINA that the Russian

Freight Forwarder would be using a new bank account at a Turkish bank that was associated

with the Turkish Freight Company to make future payments to the U.S. Freight Forwarder in

furtherance of the criminal scheme.   The Russian Freight Forwarder had previously used a

bank account at a Dutch bank associated with an affiliate of the Russian Freight Forwarder,

which was not based in Russia, to pay the U.S. Freight Forwarder in connection with the

criminal scheme.

     34.    On or about April 28, 2023, in furtherance of the criminal export and

smuggling scheme, the Russian Freight Forwarder wired approximately $95,332 from the

Turkish bank account of a non-Russian affiliate company to the U.S. Freight Forwarder's

U.S. bank account.   The $95,332 payment was for an illegal export of oil and gas parts from

the U.S. to Russia on or about April 16, 2023.

35.    On or about May 26, 2023, in furtherance of its criminal export and

smuggling scheme, the Russian Freight Forwarder wired approximately $130,163 from the

Turkish bank account of the Turkish Freight Company to the U.S. Freight Forwarder's U.S.

bank account.   The $130,163 payment was for an illegal export of oil and gas parts from the

U.S. to Russia on or about May 7, 2023.

D.    MAZULINA's Knowledge of the Export Evasion Scheme

36.    Based on her job at the U.S. Freight Forwarder, the defendant

NATALYA IVANOVNA MAZULINA was familiar with the controls concerning exports to

Russia and knew that her conduct was illegal.   For example, on or about April 28, 2023,

MAZULINA, and other U.S. Freight Forwarder employees, signed an internal compliance

certification that acknowledged receipt of an email describing in detail U.S. export controls

and sanctions regarding Russia and other countries.   The email included descriptions of

various export controls as well as hyperlinks to U.S. Government websites relating to, among

other topics, the consolidated sanctions list known as the Consolidated Screening List, HTS

code restrictions, and the Russian Industry Sector Sanctions list.   At the top of the email was

the directive, in bold text, **"For All Shipments to Russia:   Please check this link and**

**ensure to confirm that non [sic] of our HS codes show up on this list. If any of your HS**

**codes show up on this List. This cargo cannot be exported."**

37.    In another example, on or about June 29, 2023, an employee of the U.S.

Freight Forwarder who worked in the accounting department (the "U.S. Freight Forwarder

Employee") emailed the defendant NATALYA IVANOVNA MAZULINA and asked her to

provide, through the completion of certain forms, information about her clients, including

company names, billing addresses, bank account information, and physical addresses.

MAZULINA responded, "Please advise reason for this form?   What it gives to our

company?   Most of my clients pay thru 3rd countrys [sic] not direct due to sanctions."   The

U.S. Freight Forwarder Employee explained to MAZULINA that the U.S. Freight Forwarder

needed the information about its clients in case it needed to take legal action against a client

or send a client's account to collections.   When the U.S. Freight Forwarder Employee

offered to contact MAZULINA's clients directly to gather the information, MAZULINA

reiterated:

> Most of my clients [are] currently sanctioned with USA. . . . for example
> RUSSIA, IRAN. So currently they cannot pay directly with bank out or to USA.
> So they pay thru third part[ies'] banks from different country . . . and companies.
> Like you see Iran sometimes get paid thru the USA shipper. For example
> company [U.S. Freight Forwarder client] this is just forwarder (that has nothing
> to do with us) pay for 2 of my Russian customers. They just asking me to prepare
> invoice on their name since they going to pay. This is why it[']s difficult to
> provide this form for some of my main customers. So you not going to know
> who to sen[d] reminders for invoices since our system is showing bill to 3rd
> party.

## COUNT ONE
### (Conspiracy to Violate the Export Control Reform Act)

38.    The allegations contained in paragraphs one through 37 are realleged

and incorporated as if fully set forth in this paragraph.

39.    From in or about at least December 2022 through December 2024, both

dates being approximate and inclusive, within the Eastern District of New York and

elsewhere, the defendant NATALYA IVANOVNA MAZULINA, also known as "Natasha

Mazulina," together with others, did knowingly and willfully conspire to violate and to cause

one or more violations of licenses, orders, regulations, and prohibitions issued under the

Export Control Reform Act.

   40. It was a part and an object of the conspiracy that the defendant

NATALYA IVANOVNA MAZULINA, also known as "Natasha Mazulina," together with

others, would and did agree to export and cause to be exported from the United States to

Russia items identified under certain Harmonized Tariff Schedule ("HTS") codes, set forth in

Title 15, Code of Federal Regulations, Part 746, Supplement Number 4, without having first

obtained a license for such export from the U.S. Department of Commerce.

   41. It was a part and object of the conspiracy that the defendant

NATALYA IVANOVNA MAZULINA, also known as "Natasha Mazulina," together with

others, would and did agree to engage in transactions and take actions with the intent to

evade the licensing requirements set forth in the Export Administration Regulations.

   (Title 50, United States Code, Sections 4819(a) and 4819(b); Title 18, United

States Code, Sections 3551 et seq.; Title 15, Code of Federal Regulations, Sections 736.2(b)

and 746)

COUNT TWO
(Conspiracy to Defraud the United States)

   42. The allegations contained in paragraphs one through 37 are realleged

and incorporated as if fully set forth in this paragraph.

   43. From in or about at least December 2022 through December 2024, both

dates being approximate and inclusive, within the Eastern District of New York and

elsewhere, the defendant NATALYA IVANOVNA MAZULINA, also known as "Natasha

Mazulina," together with others, did knowingly and willfully conspire to defraud the United

States by impairing, impending, obstructing, and defeating, through deceitful and dishonest means, the lawful functions of BIS, an agency of the United States, in the issuance of licenses relating to the export of goods from the United States.

44.    In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant NATALYA IVANOVNA MAZULINA, also known as "Natasha Mazulina," together with others, did commit and cause to be committed, among others, the following:

<u>OVERT ACTS</u>

(a)    On or about December 13, 2022, MAZULINA emailed a U.S. company to inform the company that she had arranged for a logistics company to pick up oil and gas parts from the U.S. company and transport those parts to the U.S. Freight Forwarder's warehouse in New York for onward export to Russia.

(b)    On or about December 21, 2022, MAZULINA filed an EEI with the U.S. Government for this export that contained false information.   Specifically, it falsely listed an Uzbek company as the ultimate consignee and Uzbekistan as the country of ultimate destination when, in fact, the ultimate consignee was the Russian Gas Company and Russia was the country of ultimate destination.

(c)    On or about December 21, 2022, MAZULINA exported the oil and gas parts from the United States to Russia, via an intermediary country, for the Russian Gas Company.

(d)    On or about January 9, 2023, the Russian Freight Forwarder caused a payment to be sent from a foreign bank account to the U.S. Freight Forwarder's U.S. bank account for this export.

(e)     On or about March 6, 2023, the Russian Freight Forwarder emailed MAZULINA to advise her that the Russian Freight Forwarder would be using the Turkish Freight Company's bank account at a Turkish bank for future transactions.

(f)     On or about March 30, 2023, the Russian Freight Forwarder emailed MAZULINA and instructed her to prepare for two additional exports of oil and gas parts from the United States to the Russian Gas Company in Russia.   Attached to the email were invoices and packing lists for the two exports.

(g)     On or about March 30, 2023, MAZULINA emailed one of the U.S. oil and gas part companies and asked whether the cargo was ready to be picked up for delivery to the U.S. Freight Forwarder's warehouse in New York.

(h)     On or about April 10, 2023, the Russian Freight Forwarder emailed MAZULINA and instructed her to contact the U.S. company and book air transportation from the United States to an intermediary country, with onward shipment to Russia.

(i)     On or about April 12, 2023, MAZULINA emailed the Russian Freight Forwarder and told it that the cargo had been picked up from the U.S. company and was in transit to the U.S. Freight Forwarder's warehouse in New York from which it would be transported to Russia via an intermediary country.   Later that day, MAZULINA emailed the Russian Freight Forwarder the flight information for the shipment from the United States to the intermediary country.

(j)     On or about April 16, 2023, MAZULINA exported the oil and gas parts from the United States to Russia, via an intermediary country, for the Russian Gas Company.

(k) On or about April 16, 2023, MAZULINA filed two EEIs with the U.S. Government for these exports that contained false information.   Specifically, they listed the ultimate consignees as the Hong Kong Company and a Sri Lankan company and the countries of ultimate destination as China and Sri Lanka when, in fact, the Russian Gas Company was the ultimate consignee and Russia was the country of ultimate destination.

(l) On or about April 17, 2023, MAZULINA emailed the Russian Freight Forwarder an invoice for the April 16, 2023 exports.

(m) On or about April 28, 2023, the Russian Freight Forwarder caused a payment to be sent from the Turkish Freight Company's Turkish bank account to the U.S. Freight Forwarder's U.S. bank account for this export.

(n) On or about May 7, 2023, MAZULINA exported oil and gas parts from the United States to Russia, via an intermediary country, for the Russian Gas Company.

(o) On or about May 7, 2023, MAZULINA filed an EEI with the U.S. Government for this export that contained false information.   Specifically, it listed the Hong Kong Company as the ultimate consignee and China as the country of ultimate destination when, in fact, the Russian Gas Company was the ultimate consignee and Russia was the country of ultimate destination.

(p) On or about May 26, 2023, the Russian Freight Forwarder caused a payment to be sent from the Turkish Freight Company's Turkish bank account to the U.S. Freight Forwarder's U.S. bank account for this export.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

<u>COUNT THREE</u>
(Money Laundering Conspiracy – Smuggling)

45.    The allegations contained in paragraphs one through 37 are realleged and incorporated as if fully set forth in this paragraph.

46.    From in or about at least December 2022 through December 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant NATALYA IVANOVNA MAZULINA, also known as "Natasha Mazulina," together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds to one or more places in the United States from or through one or more places outside the United States, (i) with the intent to promote the carrying on of specified unlawful activity, to wit: the smuggling of goods as charged in Counts Ten through Twelve, contrary to Title 18, United States Code, Section 1956(a)(2)(A); and (ii) which transactions in fact involved the proceeds of unlawful activity, to wit: the smuggling of goods as charged in Counts Ten through Twelve, knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of said unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, all contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 <u>et seq</u>.)

COUNTS FOUR THROUGH SIX
(Unlawful Export of Controlled Goods from the United States to Russia)

47.    The allegations contained in paragraphs one through 37 are realleged and incorporated as if fully set forth in this paragraph.

48.    On or about the dates listed below, within the Eastern District of New York and elsewhere, the defendant NATALYA IVANOVNA MAZULINA, also known as "Natasha Mazulina," knowingly and willfully exported and attempted to export and caused to be exported from the United States to Russia the items identified below, without having first obtained the required authorization and license from the Commerce Department:

| Count | Approximate Date of Export | Exported Items | HTS Code |
|-------|---------------------------|----------------|----------|
| FOUR  | December 21, 2022         | Oil & Gas Parts | 841490  |
| FIVE  | April 16, 2023            | Oil & Gas Parts | 902519  |
| SIX   | May 7, 2023               | Oil & Gas Parts | 902610  |

each in violation of Title 50, United States Code, Section 4819; Title 15, Code of Federal Regulations, Section 764.2; and Title 18, United States Code, Section 2.

(Title 50, United States Code, Sections 4819(a) and 4819(b); Title 18, United States Code, Sections 2 and 3551 et seq.; Title 15, Code of Federal Regulations, Sections 736.2(b) and 746)

COUNTS SEVEN THROUGH NINE
(Submitting False or Misleading Export Information)

49.    The allegations contained in paragraphs one through 37 are realleged and incorporated as if fully set forth in this paragraph.

50.    On or about the dates listed below, within the Eastern District of New York and elsewhere, the defendant NATALYA IVANOVNA MAZULINA, also known as

"Natasha Mazulina," knowingly submitted false and misleading information through the

Electronic Export Information and the Automated Export System, and caused the same, in

connection with the exported items identified in each count:

| Count | Approximate Date of Export | Exported Items |
|-------|---------------------------|----------------|
| SEVEN | December 21, 2022 | Oil & Gas Parts |
| EIGHT | April 16, 2023 | Oil & Gas Parts |
| NINE | May 7, 2023 | Oil & Gas Parts |

each in violation of Title 13, United States Code, Section 305; Title 15, Code of Federal

Regulations, Section 30.71; and Title 18, United States Code, Section 2.

(Title 13, United States Code, Section 305; Title 18, United States Code,

Sections 2 and 3551 et seq.; Title 15, Code of Federal Regulations, Section 30.71)

COUNTS TEN THROUGH TWELVE
(Smuggling Goods from the United States)

51.    The allegations contained in paragraphs one through 37 are realleged

and incorporated as if fully set forth in this paragraph.

52.    On or about the dates listed below, within the Eastern District of New

York and elsewhere, the defendant NATALYA IVANOVNA MAZULINA, also known as

"Natasha Mazulina," did fraudulently and knowingly export and send from the United States,

and attempt to export and send from the United States, merchandise, articles, and objects,

and did fraudulently and knowingly receive, conceal, and facilitate the transportation,

concealment, and sale of such merchandise, articles, and objects, prior to exportation,

knowing the same to be intended for export contrary to such laws and regulations of the

United States:

| Count | Approximate Date of Export | Exported Items |
|-------|----------------------------|----------------|
| TEN | December 21, 2022 | Oil & Gas Parts |
| ELEVEN | April 16, 2023 | Oil & Gas Parts |
| TWELVE | May 7, 2023 | Oil & Gas Parts |

(Title 18, United States Code, Sections 554(a), 2 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS ONE, TWO, FOUR, FIVE, AND SIX

53.    The United States hereby gives notice to the defendant that, upon her conviction of any of the offenses charged in Counts One, Two, Four, Five, and Six, the government will seek forfeiture in accordance with Title 50, United States Code, Section 4819(d)(1), which requires any person convicted of such offenses to forfeit any of the person's property: (a) used or intended to be used, in any manner, to commit or facilitate the offenses; (b) constituting or traceable to the gross proceeds taken, obtained, or retained, in connection with or as a result of the offenses; and/or (c) constituting an item or technology that was exported or intended to be exported in violation of the Export Control Reform Act.

54.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

as incorporated by Title 50, United States Code, Section 4819(d)(2), to seek forfeiture of any

other property of the defendant up to the value of the forfeitable property described in this

forfeiture allegation.

          (Title 50, United States Code, Sections 4819(d)(1) and 4819(d)(2); Title 21,

United States Code, Section 853(p))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNT THREE

       55.     The United States hereby gives notice to the defendant that, upon her

conviction of the offense charged in Count Three, the government will seek forfeiture in

accordance with Title 18, United States Code, Section 982(a)(1), which requires any person

convicted of such offense to forfeit any property, real or personal, involved in such offense,

or any property traceable to such property.

       56.     If any of the above-described forfeitable property, as a result of any act

or omission of the defendant:

          (a)     cannot be located upon the exercise of due diligence;

          (b)     has been transferred or sold to, or deposited with, a third party;

          (c)     has been placed beyond the jurisdiction of the court;

          (d)     has been substantially diminished in value; or

          (e)     has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any

other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS SEVEN, EIGHT, AND NINE

57.     The United States hereby gives notice to the defendant that, upon her conviction of any of the offenses charged in Counts Seven, Eight, and Nine, the government will seek forfeiture in accordance with Title 13, United States Code, Section 305, which requires any person convicted of such offenses to forfeit: (a) any of that person's interest in, security of, claim against, or property or contractual rights of any kind in the goods or tangible items that were the subject of such offenses; (b) any of that person's interest in, security of, claim against, or property or contractual rights of any kind in tangible property that was used in the export or attempt to export that was the subject of such offenses; (c) any of that person's property constituting, or derived from, any proceeds obtained directly or indirectly as a result of such offenses.

58.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 13, United States Code, Section 305; Title 21, United States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS TEN, ELEVEN, AND TWELVE

59.   The United States hereby gives notice to the defendant that, upon her conviction of the offenses charged in Counts Ten, Eleven, and Twelve, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

60.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)   cannot be located upon the exercise of due diligence;

(b)   has been transferred or sold to, or deposited with, a third party;

(c)   has been placed beyond the jurisdiction of the court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

to seek forfeiture of any other property of the defendant up to the value of the forfeitable

property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States

Code, Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL

s/
FOREPERSON

*By Carolyn Pokorny, Assistant U.S. Attorney*

BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

By Jennifer K. Gellie, Acting Chief
MATTHEW G. OLSEN
ASSISTANT ATTORNEY GENERAL
NATIONAL SECURITY DIVISION
U.S. DEPARTMENT OF JUSTICE