**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AFM:MS
F. #2024R00303

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 9, 2026

By ECF

The Honorable Eric R. Komitee
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Natalya Ivanova Mazulina
Criminal Docket No. 24-493 (ERC)

Dear Judge Komitee:

The government respectfully submits this letter in advance of the defendant Natalya Ivanova Mazulina's sentencing, which is scheduled for April 23, 2026. The defendant worked as the Western Regional Manager for Delex Air Cargo LLC ("Delex"), a freight forwarding company headquartered in Queens, New York. Following Russia's invasion of Ukraine in February 2022, the defendant conspired with Russian cargo companies and others to illegally export oil and gas equipment to Russia. Using false documents, shell companies, and intermediaries in third countries, the defendant deliberately concealed her efforts to evade U.S. export controls, thereby undermining U.S. national security and helping to fuel the Russian war machine.

On October 22, 2025, the defendant pled guilty to conspiring to violate the Export Control Reform Act ("ECRA"). The government respectfully submit that a sentence within the applicable Guidelines range of 37 to 46 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

## I. Background

### A. The Export Control Reform Act and Export Administration Regulations

On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which included ECRA. *See* 50 U.S.C. § 4801 *et seq*. ECRA provided permanent statutory authority for the Export Administration Regulations ("EAR"), Title 15, Code of Federal Regulations, Parts 730-774.

Through the EAR and ECRA, the U.S. Department of Commerce ("DOC")'s Bureau of Industry and Security ("BIS") reviews and controls export from the United States to foreign countries of certain items. In particular, BIS places restrictions on the export and reexport of items that it determines could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. Such restrictions depend on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use of the item.

On February 24, 2022, in response to Russia's invasion of Ukraine, BIS imposed new license requirements on exports and re-exports to Russia. On March 3, 2022, BIS imposed additional license requirements for exports, reexports, and transfers to or within Russia of any items subject to the EAR that are identified under certain Schedule B or Harmonized Tariff Schedule ("HTS") codes. *See* 87 Fed. Reg. 12856 (March 8, 2022); 15 C.F.R. Part 746, Supp. No. 4. HTS codes take their first six digits from the corresponding Harmonized System ("HS") code, which are a standardized numerical method of classifying traded products used by customs authorities around the world.

Since March 2022, BIS has gradually restricted additional items from export or reexport to Russia. *See* 15 C.F.R. § 746.8. The additional export controls target Russia's military-industrial base and include items related to the Russian oil and gas refinery and production, aviation, and aerospace industries; commercial and industrial operations; electronics and navigational equipment; industrial machinery, lubricants, and metals; software; and chemical and biological precursors. These restrictions further limit Russia's access to items of potential military significance and expand the economic impact of controls that deny Russia additional resources it needs to continue waging war.

Under ECRA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any regulation, order, license, or authorization issued pursuant to the statute, including the EAR. *See* 50 U.S.C. § 4819(a)(1). ECRA prohibits, *inter alia*, ordering, buying, selling, and transporting items to be exported from the United States with knowledge that such conduct is a violation of ECRA, *see id.* § 4819(a)(2)(E); making any false or misleading representation and/or falsifying or concealing any material fact to an official of the United States in the course of any action subject to the EAR, *see id.* § 4819(a)(2)(F); engaging in any transaction or taking any other action with "intent to evade the provisions of this title, the Export Administration Regulations, or any order, license, or authorization issued thereunder," *see id.* § 4819(a)(2)(G); and failing or refusing to comply with associated reporting or recordkeeping requirements, *see id.* § 4819(a)(2)(H).

Additionally, an exporter of goods from the United States is required to file information with the U.S. government about the intended exports under certain circumstances. Specifically, an exporter is required to file Electronic Export Information ("EEI") through the Automated Export System ("AES") when, among other reasons, an export license was required, or the value of the commodity being exported was more than $2,500. 15 C.F.R. § 758.1. The EEI requires an exporter to list, among other things, the destination country, the ultimate consignee's name and address, the intermediate consignee's name and address, and a description of the commodity to be exported. The purpose of these requirements is to strengthen the U.S.

government's ability to prevent the export of certain items to unauthorized destinations and end users.

Failure to file EEI or providing false or misleading information in EEI is a violation of ECRA, *see, e.g.*, 50 U.S.C. 4819(a)(2)(F); the EAR, *see* 15 C.F.R. Part 758; 13 U.S.C. § 305; and the Foreign Trade Regulations, *see* 15 C.F.R. Par 30.

B. <u>Overview of the Criminal Scheme</u>

The defendant is a naturalized United States citizen who lives near Seattle, Washington, and previously worked as the Western Regional Manager for Delex, an international freight forwarding company headquartered at John F. Kennedy International Airport in Queens, New York. PSR ¶ 7. Between at least December 2022 and December 2024, the defendant conspired with Russian freight forwarding companies and others to facilitate the unlawful export of oil and gas equipment from the United States to Russia. PSR ¶ 23. The defendant and her co-conspirators used a network of overseas front companies, transshippers, and nominee bank accounts to ship export-controlled goods from the United States to intermediary countries with the intention that the goods would be reexported to Russia. PSR ¶ 24. The defendant also filed false export documents and advised Russian freight forwarding companies on how to falsify export documents and business records to avoid U.S. government scrutiny. *Id.*

1. <u>The Illegal Export of Oil and Gas Equipment to Russia</u>

The defendant often worked to facilitate the export of U.S.-origin goods for the benefit of Gazsurf, a Moscow, Russia-based oil and gas engineering firm. PSR ¶¶ 11, 26. Gazsurf specializes in natural gas compression, treatment, and processing, and its customers include oil and gas companies owned by the Government of Russia. PSR ¶ 11. In marketing materials, Gazsurf trumpets its work for the Russian military-industrial complex and Russian power plants. *Id.*

When arranging for exports, Gazsurf frequently worked through a Hong Kong-based company called Sinocom Machinery Engineering ("Sinocom"). PSR ¶ 26. Before Russia's February 2022 invasion of Ukraine, many of the EEIs filed for exports to Gazsurf identified both Gazsurf and Sinocom as connected to the transaction and declared Russia as the country of ultimate destination. *Id.* Delex did not facilitate any of these pre-February 2022 exports to Gazsurf; instead, most of those exports were handled by larger, publicly traded global shipping companies. *Id.*

After Russia's February 2022 invasion of Ukraine and the expanded export controls imposed by the U.S. Government related to Russia, Gazsurf began almost exclusively using Delex to export goods from the United States. PSR ¶ 27. After February 2022, none of the EEIs filed by Delex, however, identified either Gazsurf as the ultimate consignee or Russia as the country of ultimate destination. *Id.* Instead, the EEIs identified another intermediary company, such as Sinocom, as the ultimate consignee and another intermediary country, like China, as the ultimate destination. *Id.*

For many of these exports for Gazsurf, the defendant worked with co-conspirators at a Russian freight forwarding company called FF Cargo Services Ltd. ("FF Cargo"). PSR ¶ 28. FF Cargo is a general sales agent in the international air transportation market and operates at 10 different international airports in Russia. PSR ¶ 9. On numerous occasions, personnel from FF Cargo notified the defendant that a shipment was being prepared in the United States and requested that she facilitate the export of the goods for Gazsurf in Russia, including through intermediary countries. PSR ¶ 28.

For example, on March 30, 2023, an employee of FF Cargo emailed the defendant and told her that cargo from two U.S. oil and gas part resellers was ready for pickup and shipment to Russia. PSR ¶ 29. The FF Cargo employee told the defendant that the parts would be exported to Gazsurf in Moscow via either the Maldives or Sri Lanka. *Id.* The FF Cargo employee then asked the defendant whether the cargo from the two U.S. suppliers could be consolidated for export to Russia. *Id.* On April 16, 2023, the defendant filed an EEI for each of these two shipments for Gazsurf. PSR ¶ 30. One EEI falsely listed the ultimate consignee as Sinocom and the country of ultimate destination as China. *Id.* The other EEI falsely listed the ultimate consignee as a front company in Sri Lanka and the country of ultimate destination as Sri Lanka. *Id.* The defendant knew that the goods were ultimately destined for end users in Russia, and thus that the EEIs contained materially false statements. *Id.* On April 21, 2023, shortly after arriving in Sri Lanka, the goods—now consolidated as a single shipment—were shipped onward to Gazsurf in Moscow. PSR ¶ 31. The Gazsurf addressee in Moscow had the same name as the person who communicated with the U.S. suppliers, but had used an email account ostensibly associated with Sinocom. *Id.*

Further, some of the oil and gas parts contained in the April 16, 2023 exports were classified under HTS code 902519. PSR ¶ 32. Both EEIs claimed that no export license was required, even though, at the time, an export license was required to export or reexport goods with that HTS code from the United States to Russia. *Id.* At no time did the defendant or Delex obtain the required licenses to export or reexport these goods to Russia. *Id.*

On another occasion, in May 2023, the defendant corresponded with Gazsurf and others about another shipment of oil and gas parts from U.S. suppliers. PSR ¶ 33. The subject line of one of the email exchanges was "Gazsurf Order," indicating that Gazsurf was the true customer behind the transaction. *Id.* Like with the April 16, 2023 exports, the defendant and her co-conspirators used a front company in Sri Lanka to transship the goods to Russia. *Id.* On May 7, 2023, the defendant exported the goods from the United States to Sri Lanka. *Id.* On the EEI filed by the defendant, she falsely listed Sinocom as the ultimate consignee and China as the country of ultimate destination. *Id.* The oil and gas parts contained in this shipment were classified under HTS code 902610, which, at the time, required a license to be exported or reexported to Russia. *Id.* On May 19, 2023, shortly after arriving in Sri Lanka, the goods were reexported to Gazsurf in Russia. PSR ¶ 34. FF Cargo was listed in shipping records as the freight forwarder responsible for the Sri Lanka-to-Russia portion of the shipment. *Id.* Again, neither the defendant nor Delex obtained a license to export or reexport these goods to Russia. *Id.*

As an additional example, on December 21, 2022, the defendant filed an EEI for a shipment of oil and gas parts from the United States, claiming the parts were destined for a

company in Uzbekistan and that Sinocom was the intermediary consignee. *Id.* Business records associated with this shipment, however, showed that the parts were in fact intended to be used on oil and gas projects in Russia. *Id.* Further, FF Cargo worked with the defendant to arrange and pay for the export. *Id.* As the defendant knew, FF Cargo was regularly used by Russian companies, including Gazsurf, to procure goods from the United States for export to Russia. *Id.*

2. Defendant's Advice on Circumventing U.S. Export Controls

The defendant also advised other companies on how to circumvent U.S. export controls and falsify shipping and business records to avoid scrutiny by U.S. law enforcement. PSR ¶ 36. For example, in December 2022, another Delex employee emailed the defendant a description of new Russia-related export restrictions that one of Delex's partner cargo airlines had sent to Delex. *Id.* The Delex employee told the defendant, "No Maldives for Russian customer or similar scheme." *Id.* Shortly after receiving this email, the defendant warned an employee of an aircraft parts reseller involved in illegal exports to Russia that "there is attention for any MALDIVES shipment from CUSTOMS BORDER PROTECTION OF USA." *Id.*

On another occasion, on May 31, 2023, an FF Cargo employee asked the defendant whether she could export a shipment of goods for a customer other than Gazsurf that contained goods classified under HTS codes that had been "subject to restrictions as of May 19."[1] PSR ¶ 37. The defendant told FF Cargo that the Russian end user had two options. First, the U.S. supplier could apply for a license to export the goods. Second, the parties to the transaction could change the recipient country on the export paperwork from Russia to an intermediary country, and then FF Cargo could pick the cargo up from that intermediary country and deliver the cargo to Russia. PSR ¶ 37.

3. Money Laundering

In furtherance of the criminal conspiracy, the defendant and her co-conspirators used a variety of methods to receive illicit payments, including a network of front corporations with bank accounts in jurisdictions around the world. PSR ¶ 38.

For example, on March 6, 2023, FF Cargo told the defendant that it would be using a new bank account at a Turkish bank that was associated with a Turkish freight forwarding company (not FF Cargo) to make future payments to Delex. PSR ¶ 39. FF Cargo had previously used a bank account at a Dutch bank associated with an affiliate of FF Cargo, which was not based in Russia, to pay Delex in connection with the criminal scheme. *Id.*

On April 28, 2023, FF Cargo wired approximately $95,332 from the Turkish bank account of a non-Russian affiliate to Delex's bank account in the United States. PSR ¶ 40. The $95,332 payment was for an illegal export of oil and gas parts from the United States to Russia on April 16, 2023. *Id.*

[1] On May 19, 2023, BIS announced the expansion of certain Russia-related export controls, including the addition of dozens of HTS codes to the export restrictions imposed on Russia. PSR ¶ 37.

On May 26, 2023, FF Cargo wired approximately $130,163 from the Turkish bank account of the Turkish freight forwarding company (again, not FF Cargo) to Delex's U.S.-based bank account. PSR ¶ 41. The $130,163 payment was for an illegal export of oil and gas parts from the U.S. to Russia on May 7, 2023. *Id.*

4. The Defendant's Knowledge of the Illegal Export Scheme

The defendant was fully aware that she was breaking the law. Her experience working at Delex had taught her about controls concerning exports to Russia. PSR ¶ 42. For example, on April 28, 2023, the defendant signed a Delex internal compliance certification that acknowledged receipt of an email describing in detail U.S. export controls and sanctions regarding Russia and other countries. *Id.* The email included descriptions of various export controls as well as hyperlinks to U.S. Government websites relating to, among other topics, the consolidated sanctions list known as the Consolidated Screening List, HTS code restrictions, and the Russian Industry Sector Sanctions list. *Id.* At the top of the email was the directive, in bold text, "**For All Shipments to Russia: Please check this link and ensure to confirm that non [sic] of our HS codes show up on this list. If any of your HS codes show up on this List. This cargo cannot be exported.**" *Id.*

As another example, on June 29, 2023, an employee of Delex who worked in the accounting department emailed the defendant and asked her to provide, through the completion of certain forms, information about her clients, including company names, billing addresses, bank account information, and physical addresses. PSR ¶ 43. The defendant responded, "Please advise reason for this form? What it gives to our company? Most of my clients pay thru 3rd countrys [sic] not direct due to sanctions." *Id.* The employee explained that Delex needed the information about its clients in case it was necessary to take legal action against a client or send a client's account to collections. *Id.* When the employee offered to contact the defendant's clients directly to gather the information, the defendant reiterated:

> Most of my clients [are] currently sanctioned with USA. . . . for example RUSSIA, IRAN. So currently they cannot pay directly with bank out or to USA. So they pay thru third part[ies'] banks from different country . . . and companies. Like you see Iran sometimes get paid thru the USA shipper. For example company [Delex client] this is just forwarder (that has nothing to do with us) pay for 2 of my Russian customers. They just asking me to prepare invoice on their name since they going to pay. This is why it[']s difficult to provide this form for some of my main customers. So you not going to know who to sen[d] reminders for invoices since our system is showing bill to 3rd party.

*Id.*

5. The Defendant's Compensation

The defendant was well compensated for her work at Delex, which included a base salary as well as bonus and commissions. The parties have agreed that the portion of the defendant's compensation attributable to illegal exports (as opposed to legal ones) during the

course of the conspiracy totals $77,000. Accordingly, the parties have agreed to a forfeiture money judgment in the amount of $77,000.

### C. Procedural History

On December 4, 2024, a grand jury sitting in this District returned a twelve count indictment charging the defendant with conspiracy to violate ECRA (Count One); conspiracy to defraud the United States (Count Two); money laundering conspiracy (Count Three); unlawful export of controlled goods (Counts Four through Six); submitting false or misleading export information (Counts Seven through Nine); and smuggling goods from the United States (Counts Ten through Twelve). On October 22, 2025, the defendant pled guilty to Count One.

## II. Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration, and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." *Id.* at 49-50 (citation and footnote omitted). "When a factor is already included in the calculation of the [G]uidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the [G]uidelines calculation." *United States v. Sindima*, 488 F.3d 81, 87 (2d Cir. 2007) (quotation omitted, alterations in original) (*superseded by statute on other grounds*). "[W]here the sentence is outside an advisory Guidelines range, the court must also state 'the specific reason' for the sentence imposed, in open court as well as in writing – 'with specificity in a statement of reasons form' that is part of the judgment." *United States v. Aldeen*, 792 F.3d 247, 251-52 (2d Cir. 2015), *as amended (*July 22, 2015) (quoting 18 U.S.C. § 3533(c)(2)) (*superseded by statute on other grounds*).

Title 18, United States Code, Section 3553(a) provides that, in imposing a sentence, a court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; [and]

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C. § 3553(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." *United States v. Alexander*, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts. To the extent there remain any open issues as to the correct Guidelines range, the Court should first make any necessary finding regarding the correct range. Nevertheless, however the Court arrives at the correct Guidelines range, it still must fashion a sentence that meets the criteria of Section 3553(a) under the specific facts of this case.

## III. Analysis

### A. Sentencing Guidelines

The government agrees with the Probation Department's calculation of the Guidelines range, which is as follows:

| | |
|---|---|
| Base Offense Level (§ 2M5.1(a)(1)) | 26 |
| Less: Acceptance of Responsibility (§§ 3E1.1(a), (b)) | -3 |
| Less: Zero Point Offender (§ 4C1.1) | -2 |
| Total: | 21 |

PSR ¶¶ 49-58.

Based on a Criminal History Category I, PSR ¶ 61, the defendant's Guidelines range is 37 to 46 months' imprisonment, PSR ¶ 92.

B. A Guidelines Sentence Is Warranted

The government respectfully submits that a sentence within the applicable Guidelines range of 37 to 46 months' imprisonment is appropriate. The sentencing factors articulated in 18 U.S.C. § 3553(a) underscore the need for a Guidelines sentence.

1. The Nature and Circumstances of The Offense

As an initial matter, the "nature and circumstances of the offense" are serious and merit serious punishment. The defendant facilitated the illegal export of oil and gas components that play a critical role in Russia's war against Ukraine. Simply put, Russia cannot fund its war without the revenue it earns from fossil fuels. Russia needs people like the defendant to lie, conceal, and misdirect to procure the components necessary to keep its oil industry alive. That industry fuels the Russian aggression in Ukraine—and all the harm and devastation it has wrought. United States export controls attempt to curtail the bloodshed by cutting off the funding behind the war. The defendant's criminal acts directly undermined that effort and threatened U.S. national security.

This is not a case of mere compliance failures. The defendant knew she was violating export controls and took steps intended to achieve that end. She submitted false EEI filings, received payments from front companies, and deliberately sent exports to third countries to then reship to Russia. The defendant even advised her clients how to evade export controls themselves. These are not the actions of someone committed to "integrity" and "honest[y]," as the defendant suggests. Def. Memo at 5. Rather, she was fully aware that her conduct was deceptive and served to undermine U.S. interests, but simply did not care.

Nor was this a one-time lapse in judgment. The defendant facilitated illegal exports repeatedly, for at least two years. She had every opportunity to conform her conduct to the law, but chose not to do so. Indeed, the defendant only stopped committing these crimes because she was arrested.

The defendant's culpability is compounded by the fact that her crimes were driven by greed, not need. The defendant lives an upper-middle-class lifestyle, in which she drives a Lexus and owns a multistory, four-bedroom home. PSR ¶¶ 71, 84. Her close family members are healthy and supportive. PSR ¶ 69. Yet the record suggests she committed the instant offense simply to maintain the lucrative commissions and bonuses she earned from her Russia-based clients. The defendant has enjoyed greater privileges than many defendants who have come before this Court, yet she nonetheless made the deliberate decision to enrich herself by disregarding the law.

This crime also had real victims. Multiple victims suffered from the defendant's actions, including the banks that were subject to regulatory and financial risks, the American public whose security was undermined when the United States' adversaries earned oil revenues, and the people of Ukraine and elsewhere who have suffered at the hands of the Russian war apparatus. The defendant placed her own desire for money above the interests of each of these victims, and she deserves serious punishment as a result.

2. Specific and General Deterrence

There is a need for both specific and general deterrence in this case. As to specific deterrence, the defendant's primary motive for committing this crime was financial—she saw a business opportunity and stepped in, indifferent to the human lives it would impact. A significant sentence is necessary to convey to the defendant that the perceived financial incentive of her misconduct is outweighed by the significant consequences for those who are caught. *Cf. United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (noting that white-collar crime requires punishment to ensure that the crime's risks, discounted by the possibility of not getting caught, do not leave it as "a game worth playing") (citation omitted); *see also United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) ("[W]hite-collar criminals 'act rationally, calculating and comparing the risks and rewards before deciding whether to engage in criminal activity.'") (quoting *United States v. Warner*, 792 F.3d 847, 860-61 (7th Cir. 2015)). If the defendant were to receive a lenient sentence, she might calculate that the financial rewards were worth the risk, and thus resume the scheme with her contacts in Russia, who remain at large.

There is also a need for general deterrence. Freight forwarders like the defendant are part of the plumbing of international trade. They provide the infrastructure that, when abused, creates a means for adversary nations to advance malicious ends. Without corrupt freight forwarders, smuggling schemes like the defendant's would be unlikely to succeed. A significant sentence will send a powerful message to other freight forwarders that facilitating illegal exports to Russia will result in imprisonment and other consequences. Indeed, even freight forwarders who do not intentionally violate the law (unlike the defendant) are more likely to engage in rigorous compliance activity if they know that the failure to do so may result in serious consequences.

The defendant contends that incarceratory sentences have no real impact on general deterrence. Def. Memo at 7. But the Second Circuit has expressly rejected that argument. *See Watts v. United States*, No. 21-2925, 2023 WL 2910634, at *3 (2d Cir. Apr. 12, 2023) (summary order) (vacating sentence where district court "categorically dismissed the value of general deterrence"); *see also United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.") (quoting *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994)). Moreover, Congress itself has directed this Court to consider general deterrence in fashioning an appropriate sentence. *See* 18 U.S.C. § 3553(a)(2)(B) (directing sentencing courts to consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct").

The defendant also points to her lack of criminal history in requesting a below-Guidelines sentence. Def. Memo at 8. Her lack of prior convictions, however, is already incorporated into her Guidelines range as a zero-point offender. *See* U.S.S.G. § 4C1.1. It does not warrant an *additional* variance below the Guidelines range.

At bottom, the purpose of our export control laws is to protect our national security interests. But these laws are only as effective as their enforcement allows them to be. Absent rigorous enforcement, they cannot produce their intended result. Enforcement means not

only bringing criminal prosecutions, but imposing substantial punishment on those who put our nation at risk by violating regulations meant to keep us safe.

### 3. The Need to Avoid Unwarranted Sentencing Disparities

The Court should avoid unwarranted sentencing disparities by imposing a term of imprisonment that is in line with sentences imposed in comparable cases in this District. In recent years, similarly situated defendants convicted of offenses related to exports to Russia have generally received sentences of between 30 and 40 months imprisonment. *See, e.g.*, *United States v. Goltsev*, No. 23-CR-452 (LDH) (E.D.N.Y.) (40-month sentence for exporting sensitive electronic components to Russia); *United State v. Zharnovnikov*, No. 25-CR-45 (HG) (E.D.N.Y.) (39-month sentence for exporting controlled firearms and ammunition to Russia); *United States v. Yermolenko*, No. 22-CR-409 (S-3) (HG) (E.D.N.Y.) (30-month sentence for role in global smuggling and money laundering network related to Russia).

The defendant points to the prosecution of Alexey Brayman as a comparator, and contrasts Brayman's sentence of probation with that of his co-defendant Vadim Yermolenko, who was sentenced to 30 months in prison. Def. Memo 10-13. The defendant argues that her conduct is more like that of Brayman, rather than Yermolenko, and thus argues that she too should receive a sentence of probation. *Id.* The defendant is incorrect.

Brayman and Yermolenko were U.S.-based participants in the "Serniya Network," an international procurement and money laundering network operated on the behalf of the Russian government. *See United States v. Yermolenko*, No. 22-cr-409 (S-3) (HG) (E.D.N.Y.), Gov't Sentencing Mem., Dkt. 217. Like the defendant, Yermolenko served in a key facilitator role for other overseas co-conspirators: at their direction, Yermolenko opened front companies and nominee bank accounts in the United States, and then allowed associated to transact in those accounts. *Id.* With Yermolenko's knowledge and participation, the overseas associates purchased sensitive U.S. technology and ammunition and shipped it to third countries, where it was then reexported to Russia. *Id.* In the process, Yermolenko lied to banks and altered shipping documents. *Id.* The defendant here served in a similar role: she helped overseas co-conspirators export items to Russia by filing false export documents and facilitating third country transshipment. The primary difference between the defendant and Yermolenko is simply where they sat in the supply chain—the defendant chiefly handled logistics and international shipping, and Yermolenko mainly handled finances and money movements. Both used deception over a lengthy period to assist overseas associates export U.S.-origin goods to Russia.[2]

Brayman, on the other hand, played a less significant role in the Serniya Network. *See United States v. Brayman*, No. 22-cr-409 (S-2) (HG), Gov't Sentencing Mem., Dkt. 220. This is reflected in the fact that—unlike both the defendant here and Yermolenko—Brayman received a two-point minor role adjustment as part of his Guidelines calculation. *Id.* Indeed, Brayman's participation in the conspiracy consisted primarily of receiving packages at his house

---

[2] The defendant points out that Yermolenko ultimately pled guilty to three separate offenses. Def. Memo at 13. But those offenses all grouped together as part of Yermolenko's Guidelines calculation, and thus his Guidelines range was not impacted by his multiple counts of conviction. *Id.*

in New Hampshire, repackaging them and altering shipping documents, and then sending the packages to third countries, where they were later reexported to Russia. *Id.* The defendant here, in contrast, worked full-time for a freight forwarding company, facilitated large-scale overseas shipments, submitted false documents to the U.S. government, and coached other co-conspirators on how to break U.S. law. As part of the Serniya conspiracy, Brayman earned $6,000. *Id.* The defendant earned more than ten times that amount—$77,0000—and just slightly more than the $75,000 earned by Yermolenko. *See United States v. Yermolenko*, No. 22-cr-409 (S-3) (HG) (E.D.N.Y.), Gov't Sentencing Mem., Dkt. 217.

For these reasons, the defendant's reliance on *Brayman* is unavailing, and the Court should sentence the defendant in line with other comparable recent cases in this District, including *Yermolenko*, *Goltsev*, and *Zharnovnikov*.[3]

4. Forfeiture, Fines, and Restitution

As noted above, the parties agree that the defendant should pay a forfeiture money judgment in the amount of $77,000. In addition, the government submits that, given the defendant's financial assets, *see* PSR ¶ 84, she should be ordered to pay a fine within the applicable Guidelines range of $15,000 to $1 million, *see* PSR ¶ 100. Finally, the government is not seeking restitution.

[3] Indeed, even considering cases outside of this District—and relating to countries beyond just Russia—the defendant's request for a sentence of probation is not supported. The Judicial Sentencing Information Tool available from the United States Sentencing Commission states that, "[d]uring the last five fiscal years (FY2021-2025), there were 14 defendants whose primary guideline was §2M5.1, with a Final Offense Level of 21 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure." United States Sentencing Commission, *Judiciary Sentencing Information (JSIN)*, available at https://jsin.ussc.gov. Of those 14 defendants, each received a sentence of incarceration, with the average sentence length being 15 months' imprisonment. *Id.* The defendant acknowledges similar data—with a longer average sentence—for fiscal years 2020 through 2024 for adjusted offense level 23. *See* Def. Mem. 10.

IV. Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a Guidelines sentence of between 37 and 46 months' imprisonment, a fine of between $15,000 and 1$ million, and a forfeiture money judgment of $77,000.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Matthew Skurnik
Assistant U.S. Attorney
(718) 254-6231

cc: Clerk of the Court (ERK) (by ECF and E-mail)
Defense Counsel (by ECF and E-mail)