UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | **Docket#** 24-cr-00493-EK-LKE |
| - versus - | : | U.S. Courthouse Brooklyn, New York |
| NATALYA IVANOVNA MAZULINA, | : | |
| Defendant | : | June 24, 2026 11:08 a.m. |

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE ERIC R. KOMITEE
UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S:**

**For the Government:** **Joseph Nocella, Jr., Esq.**
Interim United States Attorney

BY: **Matthew Skurnik, Esq.**
Assistant U.S. Attorney
271 Cadman Plaza East
Brooklyn, New York 11201

**For the Defendant:** **Lorraine Gauli-Rufo, Esq.**
LGR Law, LLC
6 Pompton Avenue, Suite 25
Cedar Grove, NJ 07009

**Transcription Service:** **Transcriptions Plus II, Inc.**
61 Beatrice Avenue
West Islip, New York 11795
RL.Transcriptions2@gmail.com

Proceedings recorded by electronic sound-recording, transcript produced by transcription service

THE CLERK: Criminal Cause for Sentencing, docket number 24-cr-493, *USA v. Natalya Mazulina*.

Counsel, please state your appearances for the record beginning with the government.

MR. SKURNIK: Good morning, your Honor. Matthew Skurnik for the United States.

THE COURT: Good morning.

PROBATION OFFICER: Good morning, your Honor. Frank Nikolaidis from the Probation Department.

PROBATION OFFICER: Good morning, your Honor. Samirah Nizam-Poon from the Probation Department.

THE COURT: Good morning to you both.

MS. GAULI-RUFO: Good morning, your Honor. Lorraine Gauli-Rufo on behalf of Natalya Mazulina who is seated next to me, your Honor.

THE COURT: Good morning to you. And Ms. Mazulina, good morning to you as well.

THE DEFENDANT: Good morning.

THE COURT: All right. We're here today for sentencing in this case. Ms. Mazulina, it's obviously very important that you hear and understand everything that's being said today. If you miss something and want it repeated or if you don't understand something and you want a moment to confer with your counsel, let Ms. Gauli-Rufo know that and we will pause the proceedings to

make that happen. Do you understand what I'm saying?

THE DEFENDANT: Yes.

THE COURT: Okay. Here's the process we're going to go through today.

The first thing I'm going to do is list all the submissions that I've received in connection with sentencing from everyone, from the defense, from the prosecutor, and from the Probation Department. And the purpose of me listing that is to make sure that I have everything I should have and that we are all working off the same information.

Next, we're going to discuss the pre-sentence information report which you may hear me refer to as the PSR. That is the report, as you know, prepared by the Probation Department to assist me with understanding the nature and circumstances of the offense, the history and characteristics of you the defendant, and the like. And we'll talk about the sentencing guidelines calculation in that context.

After that we'll hear statements from the attorneys, from your attorney and from the government attorney.

And then, Ms. Mazulina, you will have the opportunity to make a statement if you wish before I impose sentence.

Once all that has happened, I may or may not take a short break to collect my thoughts. And following that, I will impose sentence.

Do you understand the process I've just laid out?

THE DEFENDANT: Yes.

THE COURT: Do you have any questions?

THE DEFENDANT: No.

THE COURT: Okay. I take it the government is not seeking to introduce any testimony from victims today. Is that correct?

MR. SKURNIK: That's correct, your Honor.

THE COURT: Okay. Was there any victim notification required in this case?

MR. SKURNIK: There was not.

THE COURT: All right. Let me say a word about the guilty plea in this case. Ms. Mazulina pleaded guilty to Count 1 of a 12 count indictment before Magistrate Judges Eshkenazi on October 22nd of last year. That plea was to well Count 1 to which the plea was entered, charge conspiracy to violate the Export Control Reform Act under 50, five zero, U.S. Code Sections 4819(a) and (b). I accepted that guilty plea on January 7th of this year.

Here are the documents that I've received and

reviewed in connection with today's proceeding.

The pre-sentence report dated March 19th of this year and an addendum thereto dated April 17, 2026.

I also have the Probation Department's sentence recommendation dated March 19th, the same day as the PSR.

Does the defense have the sentence recommendation from the Probation Department?

MS. GAULI-RUFO: Yes, your Honor, we do.

THE COURT: Okay. Probation Department, just so you know, is an arm of the court, not the executive branch of the government. They happen to be sitting at the prosecutor's table but they are not part of the prosecution team. They essentially work for the court. They see every sentencing in this district. They have a lot of data, a lot of experience with the guidelines, and they make a sentence recommendation to the Court at every sentencing proceeding. That recommendation is not binding on me in any way but I do review it. And because the Probation Department sees everything, I do think about it and because of that I make sure that every defendant is aware of what the Probation Department is recommending in terms of the sentence.

I have a sentencing memorandum from the defense dated April 8th of this year together with 12 letters of support.

I have the government's sentencing memorandum dated April 9th. We received a proposed order of forfeiture from the government on April 22nd and I entered that order on May 11th of this year.

The government made an ex parte submission on April 23, 2026. I think that's reflected on the docket. I won't indicate what that was except to say that it related to certain defendants in other cases that are not this one. They were not advising me about anything concerning this case specifically.

Does the defense have any questions about that submission?

MS. GAULI-RUFO: No, your Honor, I don't.

THE COURT: Okay. All right. So that's the list. We also -- we did circulate or did not circulate notice -- we did not circulate any notice of contemplated special conditions of supervised release. That's all I have for this list.

Starting with the defense, is there any other sentencing submission that I should have but that I did not list?

MS. GAULI-RUFO: No, there isn't, your Honor. However, I would just like to note for the record that Ms. Mazulina did pay the forfeiture. And in the docket there is a process receipt and return that was filed on

the docket showing that she had paid that full and I just wanted to note that that was done and in the docket, your Honor.

THE COURT: Thank you. So noted. From the government's perspective, anything else I should have listed?

MR. SKURNIK: Nothing further.

THE COURT: And from Probation?

PROBATION OFFICER: No, your Honor.

THE COURT: Okay. All right. For the defense, Ms. Gauli-Rufo, have you and your client read and discussed the pre-sentence report?

MS. GAULI-RUFO: Yes, we have, your Honor.

THE COURT: Have you had a sufficient opportunity to discuss any potential issues?

MS. GAULI-RUFO: Yes, I have.

THE COURT: Any objections to the PSR?

MS. GAULI-RUFO: No, your Honor.

THE COURT: Okay. And that includes the guidelines calculation?

MS. GAULI-RUFO: That's correct, your Honor.

THE COURT: Okay. All right. If that's the case then I will now adopt the pre-sentence report in its entirety. The pre-sentence report uses the 2025 version of the sentencing guidelines manual. The relevant

guideline section for this offense is 2M as in Mary 5.1 which provides a base offense level of 26 since the offense involved a financial transaction with a country supporting international terrorism. That is the adjusted offense level. There are no specific enhancements beyond that.

We then subtract three points for timely acceptance of responsibility and we subtract an additional two points because Ms. Mazulina qualifies as a zero point offender under Section 4C1.1.

That leaves us with a total offense level of 21. Ms. Mazulina is in criminal history category I, Roman Numeral I. And based on a total offense level of 21 and a criminal history category of I, the United States Sentencing Guidelines provide for an advisory range of imprisonment of 37 months at the low end of the range to 46 months at the high end of the range, 37 to 46 months. Again, the guidelines are advisory, not mandatory.

The guidelines also advise a range of supervised release from zero years to three years and a fine range of $15,000 at the low end to $1 million at the high end.

Any questions or qualms, Ms. Gauli-Rufo, about anything I've just said?

MS. GAULI-RUFO: No, your Honor.

THE COURT: Does the government agree?

MR. SKURNIK: Yes, your Honor.

THE COURT: And Probation?

PROBATION OFFICER: Yes, your Honor.

THE COURT: Okay. All right. Turning from the sentencing guidelines to the statutes that are in play here, the statutory maximum term of imprisonment for a violation of Section 4819(b) is 20 years. 20 statutory maximum. There is no mandatory minimum.

The statutory maximum term of supervised release, the longest term of supervised release that I can impose following any term of incarceration, is three years.

Restitution, Mr. Skurnik, is not applicable here?

MR. SKURNIK: That's correct.

THE COURT: Okay. The maximum fine by statute is $1 million. There's also the alternative fines provision which would allow me to impose a fine of twice the gross gain or loss, 2x the gross gain or loss, but I don't believe that would exceed the million dollar threshold here and therefore, we're not working with the alternative fines provision. Is that correct?

MR. SKURNIK: Yes, your Honor.

THE COURT: Okay. Finally, a special assessment of $100 is mandatory.

From the defense, any questions or qualms about what I just said about the statute?

MS. GAULI-RUFO: No, your Honor.

THE COURT: Statutes. From the government?

MR. SKURNIK: No, your Honor.

THE COURT: Okay. All right. We will now then hear argument from the attorneys for both sides beginning with the defense.

Let me just say before I turn things over to defense counsel two questions jump out at me from the record here including the PSR.

One, I wonder if it's possible for me to understand better the motive for this crime. The government's sentencing submission indicates that Ms. Mazulina was paid on commission, or paid a discretionary bonus, or both, and that therefore the more business she did with the firm's clients, the more money she made. But I don't think the record -- well, I'd like to hear more about how much additional money she made in commissions or bonus as a function of the business that led to this conviction. That's question one.

And question two, I'm advised that the items that were being exported were to be used in oil and gas

drilling or refining but there's not a lot of specificity beyond that. And I'm interested to know whether these were more routine items on the one hand or technologically sensitive items on the other hand. I'm also of course interested to hear whatever the parties think I should hear in connection with sentencing.

With that, I will turn it over to the defense.

MS. GAULI-RUFO: Thank you, your Honor. Can I just have one moment?

THE COURT: Please.

(Pause)

MS. GAULI-RUFO: Thank you, your Honor. I can remain seated?

THE DEFENDANT: Yes. Most important is to have you on the microphone.

MS. GAULI-RUFO: Thank you. It's not my norm so I'm going to try not to stand.

THE COURT: You can stand if you prefer. It's entirely up to you.

MS. GAULI-RUFO: Actually, I'm going to stand, your Honor.

THE COURT: Okay.

MS. GAULI-RUFO: I'm just so used to it for so many years. Thank you, your Honor.

We did submit a sentencing submission. As your

Honor noted, we are asking for a variance in this case for Ms. Mazulina.

Our position is that a non-custodial sentence is sufficient but not more than necessary to satisfy the goals of sentencing particularly in light of all of the 3553(a) factors that I'm going to set forth for your Honor or highlight for your Honor and the Court right now.

First, I would note Ms. Mazulina is a first-time offender. She has, other than this experience with the criminal justice system, none whatsoever. She has a long work record as a matter of fact at Delex which is where this offense did take place. She was working for 14 years, 12 years before anything of this sort happened. Deep family ties in Washington and an extraordinary, extraordinary record of caring for others which is demonstrated in the 12 letters that we've submitted to the Court.

This conduct was serious, your Honor, very serious, but her life as a whole shows a person has spent decades contributing to society, supporting and serving in a lawful way.

First of all, your Honor, I would like to point out that Ms. Mazulina has already shown an extraordinary amount of acceptance of responsibility not only in her

words, I'm sorry, or whatever she's going to say to the Court today which I know is genuine and she means it. However, she heard that she had to pay forfeiture. She went out, she gathered money from her family, from her friends, whatever she had to do. I think her daughter contributed as well who's in college. And she paid the forfeiture immediately. It was paid on June 2nd soon after she received the forfeiture order and it was discussed with me.

I think that's extraordinary, it shows an extraordinary acceptance of responsibility and an action that yes, she had to do it, she agreed to do it, but she did it quickly, fully, and completely. And again, it's just an example of the person that Ms. Mazulina is.

She's been on pretrial release for a year and a half, your Honor. She has complied in every respect of the conditions that were imposed on her. She's clearly demonstrated she's not a danger to the community. She's 43 years old. She has no criminal record, no substance abuse, strong employment background. It's highly unlikely that Ms. Mazulina will ever commit a crime in the future, another crime in the future.

Moreover, she's the sole caretaker of her mother. That has become her source of employment which I think is another factor that sets Ms. Mazulina apart from

others. She was in this field for her entire career basically. When this happened, your Honor, she went, she found another career that she could begin and that was as a caretaker. She found a need. Her mother needed a caretaker. And that became her employment.

She's a problem solver. She's someone who's going to go out and do the next right thing and not let this keep her down.

This is a case, your Honor, where I believe disparity matters. And I did submit to the Court information regarding the sentences in this district that dealt with a huge Serniya network that involved two defendants who were sentenced, charged and sentenced in this district, Yermolenko and Brayman.

You know, the government in their sentencing submission was trying to equate Ms. Mazulina with one of the most aggravated actors in that conspiracy which is Yermolenko. I hope I'm saying his name right. But there's so many differences and substantially different the facts of this case and the facts of that case, his role in that case and her role in this case, that needs to be highlighted, your Honor. That case was an intricate years long scheme that involved, according to the government's own sentencing submission, global procurement and money laundering network operated on

behalf of the Russian government.

THE COURT: How long was the scheme here?

MS. GAULI-RUFO: Two years, your Honor, and involved three shipments in two years.

In that case, your Honor, Yermolenko, he was the financial engine of the conspiracy and it was a -- he created and managed shell companies. He created and managed nominee accounts. He moved millions through the banking system and served as a hub through which the network's most dangerous acquisitions there were funded.

Moreover -- and I know your Honor had asked the questions about this machine parts, and my understanding is that first of all, these machine parts were parts before the law was imposed that you can't send these parts to Russia. These parts were regularly a part of her shipments that were sent to Russia. I think they do go into machine, cars or trucks that can be used for the war. And I'm sure the government will add to that. But in the Yermolenko case, your Honor, they were importing sniper rifle machineries and things of that sort.

His conduct was sophisticated, it was financially significant. There was an overarching leader of the conspiracy who he was in touch with, as well as Brayman who -- and again, Brayman is the other defendant who was sentenced in this district and the government,

you know, is stating that Ms. Mazulina's conduct is much more serious than his.

I would just like to point out a couple of things about Brayman. He worked out of his garage, yes, but he was in constant contact with the leader of the operation of this huge, huge conspiracy, multimillion dollar conspiracy that involved Russian officials and the Russian government. And the government's own description of that says it used military use ammunition sniper rifles and advanced electronics with obvious defense applications. I think there's a difference with machine parts that could go into trucks and cars they were using in the war. They were precluded from being sent to Russia. She does know that.

She's not charged with creating shell companies, moving money and bank accounts, creating bank accounts, creating nominee accounts, and not organizing or orchestrating a large conspiracy. Nor did she deal directly with a leader of a large conspiracy. Her conspiracy was her and a company, one company And involved three shipments.

I think this difference matches significantly for 3553(a)(6), your Honor, and I submit that a custodial sentence here would overstate her culpability and create an unwarranted disparity in these cases.

I think her letters tell the story of the type of person she is. As I noted before, she's the emotional center of her family, sole caregiver of her mother, the person who repeatedly opened her home to others. There's a letter of someone who came from Ukraine and needed a place to stay and she opened her doors and let that person in. This is not a case where we're asking the Court to ignore the offense. We're asking the Court to weigh all these factors that 3553(a) demands, and ask this Court to sentence her, the person, not just for the charge but also for the facts supporting the charge and the background of the facts.

For those reasons, your Honor, we respectfully request that your Honor vary downward and impose a non-custodial sentence with conditions, home confinement. We submit that that punishment is punishment that would suffice and satisfy the goals of sentencing here when taken into account with her background, her character, forfeiture she's already paid, unwarranted disparities, and the nature of the offense.

We also respectfully request that the fine be waived in this case, your Honor. I would note that Ms. Mazulina did pay the forfeiture in full. That --

THE COURT: Tell me how you understand the forfeiture dollar amount to have been calculated. That's

sort of the agreed-upon

MS. GAULI-RUFO: Yes.

THE COURT: -- sum of ill gotten gains.

MS. GAULI-RUFO: The government and I calculated that amount, your Honor, through looking at her dealings in the past two years with this particular company and comparing it to nearest past and to any increases that would have come about by these shipments with the company. That's the best of my recollection of how we cane about it. We went back and forth for a while on this, your Honor.

THE COURT: Okay. And so the net worth figure that's reported in the PSR, paragraph 84, is that meaningfully lower now because of the payment of forfeiture or this is net of forfeiture already?

MS. GAULI-RUFO: Let me just take a look, your Honor. I'm sorry.

(Pause)

MS. GAULI-RUFO: I'm sorry, the question is whether her financial -- oh, her ability to pay.

THE COURT: Her total net worth figure.

MS. GAULI-RUFO: Oh, her total net worth figure.

THE COURT: Which is just a shade under half a million dollars.

(Pause)

THE COURT: And I understand that most of this net worth is tied up in a house. I just want to make sure I understand the numbers correctly.

(Pause)

THE COURT: You are on a live microphone if that matters.

MS. GAULI-RUFO: I'm sorry, your Honor. All the information that is set forth here I confirmed with my client is still correct. Is that correct? All this --

THE DEFENDANT: Mm hm.

MS. GAULI-RUFO: You still have that?

THE DEFENDANT: Mm hm.

MS. GAULI-RUFO: Yes, your Honor, still that.

THE COURT: Okay. All right. Thank you. Mr. Skurnik?

MS. GAULI-RUFO: Thank you.

MR. SKURNIK: Yes, your Honor. I'll just start where we just left off with the forfeiture figure which is the parties over several months has extended discussions and negotiations about the specific amount of money the defendant would have earned attributable to the unlawful shipments because while she's working for this company Delex a number of her shipments were legal and

some were illegal. And so we had negotiations to determine what is the amount of her base salary, commissions, and bonuses that are fairly attributable to the illegal transactions and that's how we reached the $77,000 figure.

So I think what that number represents is the ill-gotten gains that the defendant received as part of the scheme.

THE COURT: Okay.

MR. SKURNIK: So moving from that, just --

THE COURT: Do you see any additional indications of motive? Is there any contact with anybody you believe to be a representative of or working on behalf of the Russian government here?

MR. SKURNIK: No, your Honor. From the government's perspective, I don't think we have direct evidence of motive. I think we have circumstantial evidence which is the defendant was paid by commissions and bonuses and received additional money for these shipments.

And I think when you do it in context, the defendant had, prior to the Russian invasion of Ukraine and the imposition of a number of these applicable sanctions, the defendant had a lot of customers who received shipments of oil and gas parts, it was lucrative

to the defendant. Sanctions are imposed and the defendant knowing that continuing to ship this equipment was illegal continued to do so and created ways to basically get around the sanctions.

And so I think the fair inference to draw from these facts is that the defendant was motivated by profit.

And I think what's important about that is that number one, this is not a case about compliance failures. It's not about negligence or turning a blind eye. This was a deliberate intentional effort to shift these items to --

THE COURT: Well, we wouldn't be here otherwise, right? It wouldn't be a crime if it was merely a negligent compliance failure.

MR. SKURNIK: That's correct, your Honor. But where I think it matters is in measuring the defendant's culpability there's significant fraudulent conduct the defendant engaged in in service of this scheme which includes submitting false information on export filings, receiving payments from front companies knowing that those front companies were not the ultimate recipient of the goods that were being shipped, shipping goods to third countries like China, Hong Kong, Sri Lanka, Uzbekistan knowing that items would then be re-shipped to

Russia, and even Ms. Mazulina advising some of her clients about how to get around U.S. export controls.

In one instance, she told a client specifically to avoid using the Maldives for an illegal shipment due to "attention from the U.S. Government."

In another option she said to a client look, you have two options for how to do this transaction. Option one, you can request a license from the Commerce Department, which would be the lawful option. Or option two, you could change the paperwork and change the recipient country and company on the paperwork and reroute the shipment through a third country.

So I think that sort of fraudulent conduct in combination with the fact that this was not a one time mistake, as we just heard it lasted for two years, the defendant had every opportunity to conform her conduct to the law and chose not to.

In the end, the only thing that stopped these crimes was the defendant' arrest in this case. There was no independent decision prior to her arrest to stop engaging in this conduct.

Your Honor had a question earlier about the nature of the items and their impact on national security. So the items at issue in this case are industrial oil and gas equipment which means that the

sort of equipment that could be used in refining, extracting oil. They are not subject to national security controls. So they are different from, for example, either weapons like a weapon or ammunition. They're also different from, for example, a semiconductor or some advanced piece of electronic that would be controlled for national security reasons.

They are instead subject to sectoral sanctions imposed by the Commerce Department which basically say here's a wide category of goods that cannot be exported to support the Russian oil and gas industry.

So I don't want to say here today that the items themselves are especially technical or have themselves particular national security uses. But I think where it matters is the sanctions that are in place reflect --

THE COURT: Is that a point of distinction with some of the quote/unquote comparable cases you cite in your sentencing submission? We heard from the defense that at least one of those cases involved weaponry.

MR. SKURNIK: That's correct, your Honor. I would say the items in this case, it is a difference between this case and the other cases cited by the parties in their briefing that in this case the items themselves are not subject to the same national security

controls that certainly were subject in the Serniya case. I was government counsel in that case and in some of the other cases that we cite in our briefing. I think those were all national security control cases.

I don't think that distinction bears a huge amount of weight here though and the reason is the sectoral sanctions placed on the Russian oil and gas industry reflect a judgment by the Commerce Department and the executive branch that the oil and gas industry in Russia is a critical component of the war in Ukraine. It supports, it funds the war. And the judgment by the executive branch to impose broad sanctions on that industry is in service of the U.S. Government's national security goals. And enforcement and strong punishment for people who evade those sanctions is important in a case like this.

It's important for specific deterrence but also for general deterrence. Freight forwarders like the defendant are critical to sort of the infrastructure of international trade. They are critical to smuggling schemes like this. Without freight forwarders who are willing to shift things to third countries, to falsify export documents, it becomes very difficult for industries like the Russian oil and gas industry to sustain themselves and to sustain their support for the

war in Ukraine.

I'll just finish by saying, your Honor, that, and this sort of brings us full circle back to motive here, which is the defendant, I think unlike many defendants who come before your Honor, she has and had a degree of privilege. She lived sort of a comfortable middle-class lifestyle, owned a four-bedroom home, drove a Lexus. And I think the only conclusion to offering these facts is that she engaged in this conduct simply because she wanted to keep earning the commissions and the bonuses that came from it. It came from a place of greed. She put her own profit above the national security interests of the United States. And we respectfully request the guidelines sentence.

THE COURT: Okay. Thank you.

So I just want to sum up and make sure I have this correct. Is it fair to say that the conduct at issue here began before these export controls went into effect and therefore, what we have here essentially is a course of conduct by Ms. Mazulina that was entirely legal when it started, became illegal midstream, that she knew had become illegal and elected to continue? But if that's fair, this is not a case where somebody's approached initially or comes up with the idea themselves to engage in a scheme specifically for the purpose of

evading export controls from the get go?

MR. SKURNIK: So that's largely correct, your Honor. But what I will say is before the sanctions are imposed, the defendant is shipping items basically directly to Russia. Then the sanctions are imposed. At that point it's impossible to do it directly.

THE COURT: Right.

MR. SKURNIK: So then her working with co-conspirators come up with a scheme to send items to third countries, to falsify documents. So it's not as if sort of the same conduct continued.

THE COURT: Understood and point well taken. All right. Thank you.

Ms. Mazulina, would you like to make a statement at this point?

MS. GAULI-RUFO: Your Honor, before Ms. Mazulina makes a statement, I would like to correct something that I noted. In the asset section on page 84, I mean paragraph 84 --

THE COURT: Paragraph 84.

MS. GAULI-RUFO: -- Ms. Mazulina sold her car, her Lexus, so that was part of the forfeiture amount that she paid. So she just corrected me with that. So that would change I guess the assets there and I wanted to make your Honor aware of that.

THE COURT: So she and her husband have non car at this point?

MS. GAULI-RUFO: They do have a car, your Honor, but not a Lexus at this point.

THE COURT: They have a car that they own or lease?

MS. GAULI-RUFO: It's her husband's work car, your Honor. He owns a restaurant.

THE COURT: Okay. Was that a new purchase or was that --

(Pause)

MS. GAULI-RUFO: It's a Honda, your Honor, and she indicated that it may be worth 20,000. Yeah. Maybe less she's saying.

THE COURT: Okay. I don't have the net worth statement, just this summary of her financial condition. But the assets section here doesn't list any ownership interest in the business.

MS. GAULI-RUFO: The business is not worth anything, your Honor.

THE COURT: He owns the restaurant or he works at the restaurant?

(Pause)

MS. GAULI-RUFO: Your Honor, Ms. Mazulina's husband is in the courtroom. Can I just ask him if it is

worth something and why it wasn't put in here? I'm not sure why --

THE COURT: Yes, please.

MS. GAULI-RUFO: Thank you.

(Pause)

MS. GAULI-RUFO: Thank you. Her husband has advised me that the restaurant is a corporation. Ms. Mazulina is not part of that corporation and that's the reason that it wasn't put into their financials.

THE COURT: Presumably these are marital assets and presumably if the restaurant is a going concern, it has some value, some non-zero value. This obviously raises a question about the completeness of the personal financial statement that was submitted.

All right. Is there anything else you wanted to say?

MS. GAULI-RUFO: That's all, your Honor. Thank you.

THE COURT: Okay. Ms. Mazulina, do you want to make a statement?

THE DEFENDANT: Yes. Your Honor, I stand before you with deep respect and sincere sense of responsibility for my actions. I want to clearly state that I accept full responsibility for what I did. I made a decision that led me here and I take ownership of that

without any excuse.

I understand that my actions were wrong and violated the law. I also understand the seriousness of this offense and the broader consequences that can result from conduct like mine. I do not minimize my role in any way.

This has been one of the most difficult and humbling periods of my life. It has forced me deeply to reflect on my judgment, my choices, and standards I must hold myself to moving forward.

I committed to live differently. I value honesty, accountability, and doing things the right way. I'm prepared to accept the consequences of my actions and rebuild my life with integrity and purpose.

I'm also grateful for my family who have supported me through this time. They remind me every day of the person I want to be and the life I committed to living.

Your Honor, I respectfully ask the Court to consider my character and my commitment to make meaningful and lasting changes in my life. I am determined to move forward in a lawful and responsible way thank you for your time and consideration.

THE COURT: Thank you. All right. I'm going to take a very short break here probably in the nature of

five minutes or so just to collect my thoughts and I will be back momentarily.

(Pause)

THE COURT: Please be seated. All right. Thank you all for your patience.

I've considered the relevant factors set out by the United States Congress at 18 U.S. Code Section 3553(a) including the advisory United States sentencing guidelines range in an effort to ensure that I impose a sentence that comports with the purposes of sentencing. Congress has told me what are the purposes of sentencing that I need to consider.

Those purposes include the need for the sentence to reflect the seriousness of the crime, promote respect for the law, provide just punishment for the offense of conviction. This next one is oftentimes the most important, to deter communal conduct both by the defendant being sentenced today and to deter potential criminal conduct by others who might seek to engage in this type of crime in the future.

I'm also obligated as best I can to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.

In addition to the nature and circumstances of

the offense, I've also considered the history and characteristics of the defendant here today.

The guidelines range here is 37 to 46 months. The defense has essentially requested probation. The United States Probation Department has recommended a 37 month sentence, and the government has requested a guidelines sentence.

We look at the statistics in the judiciary sentencing information, nationwide statistics database, and the United States Sentencing Commission's interactive tool and the mean and median sentences you see for similar conduct in those two sources are a bit lower than the guidelines are here. And I'll just give one.

The U.S. Sentencing Commission's interactive tool indicates a mean, mean sentence length in the Eastern District and Southern District of New York for the past three fiscal years for defendants sentenced under guideline 2M5.1 and in criminal history category I the mean is 24 months and the median sentence length is 26 months.

My practice at sentencing is to talk through both the aggravating and the mitigating factors in a given case. I aggravating, I mean the factors that would call for a higher sentence all things being equal. And by mitigating, I mean the factors that would call for a

lower sentence all things being equal.

The most important aggravating factor here is the seriousness of the offense conduct. This conduct was not momentary. It went on for years. It involved extensive machinations to conceal the reality of what was being exported here and it happened during a time of war. So there are -- and by war I mean the war between Russia and Ukraine.

There are export control violations and then there are export control violations. There's a relatively famous case in the southern district from a long time ago in which a restauranteur in Manhattan was selling Cuban cigars to patrons at his steakhouse for an after dinner smoke in violation of the U.S.-Cuba embargo. I don't know what the sentence was in that case but the U.S. and Cuba were not shooting at each other at the time and the cigars were not the kind of export, or I guess in that case import, product that might in any way affect the conduct of the war. Obviously, every case is different. Every case has to be considered on its own merits. But hopefully that's of some utility in kind of locating us in the constellation of export control violations here.

On the mitigating side of the equation, as defense counsel has pointed out, this is Ms. Mazulina's

first offense. She has lived an otherwise productive and law-abiding life. The conduct here was, for reasons we've discussed, less concerning than the conduct in at least some of the government's quote/unquote comparable cases especially the ones involving more extensive network of criminal activity and the export of products that were inherently dangerous.

As I understand the record here, the oil and gas related products here might have had some military use possible, but they were not inherently dangerous. We're not talking about the export of weapons technology or the like.

And we've discussed this also, there is, for what it's worth, the fact that these were existing relationships that Ms. Mazulina had even before the export of the products at issue was made illegal. So all that needs to be taken into account on the mitigating side of the equation.

I know that defense is asking for a non-custodial sentence here. I think the cause of deterrence, especially general deterrence, rules that out as a possibility. I have considered it. My process is always to start with the question of whether any jail time is appropriate and necessary or not before I get to the question of how much jail time. And I have thought

through that question here as best I can. I do not believe a non-custodial sentence would adequately reflect the seriousness of the crime or importantly serve adequately to deter future criminal conduct of this nature including by others. I think the cause of deterrence requires a meaningful term of incarceration even if it does not require the full term that the guidelines would advise.

And so, Ms. Mazulina, after assessing the particular facts of this case and in light of the relevant Section 3553 factors, I sentence you to 18 months of incarceration, one eight. I don't know that a term of supervised release would serve much purpose here but I'm interested in the government's thoughts on that question before I land one way or the other.

MR. SKURNIK: Your Honor, the government supports Probation's recommendation of one year supervised release.

THE COURT: Why?

MR. SKURNIK: As we spoke about earlier, the conduct in this case appears to have been primarily driven by profit and I think that incentive may remain after the --

THE COURT: She lost her job though, right? She's no longer working at the exporter.

MR. SKURNIK: That's correct, your Honor.

THE COURT: Does Probation want to be heard on this? Is there --

PROBATION OFFICER: Your Honor, in our sentence recommendation we kind of spell out why we believe that there's a need for supervised release beyond the length of the time that we recommended. You know, it's a very serious offense. It spanned two years time, relied on co-conspirators domestically and abroad, threatened national security.

THE COURT: Yes.

PROBATION OFFICER: These are all --

THE COURT: I mean the national security imperative is obviously well taken. It might be more well taken if there was some indication in this case that Ms. Mazulina had any contact with representatives of a foreign power.

Does the defense want to be heard on the question of supervised release?

MS. GAULI-RUFO: No, your Honor.

THE COURT: All right. I will impose a one-year term of supervised release subject to all the mandatory and standard conditions laid out in the pre-sentence report and will not impose any special conditions beyond those.

Ms. Gauli-Rufo, do you waive a public reading of the mandatory and standard conditions that are set out in the PSR?

MS. GAULI-RUFO: Yes, I do, your Honor.

THE COURT: Okay. I'm going to order marijuana testing to be suspended from the drug testing panel if there is to be one. Restitution is not applicable in this case. The forfeiture order that's been entered is already final as it was entered on consent, so Ms. Mazulina has been ordered to pay that money judgment. And I understand that the amount has already been paid in full.

In terms of a fine, I can't get to the conclusion, or I don't get to the conclusion, that Ms. Mazulina lacks the ability to pay a fine given the relatively substantial net worth statement in the pre-sentence report. I also understand though that most of the family's net worth is, at least to the extent it's reflected here, is tied up in the house which is not really available for the payment of a fine, but there are some liquid assets as well. And so I will impose a fine of 10,000 U.S. dollars, obviously, below what is dictated by the guidelines as well. That fine should be payable at a rate of 10 percent of Ms. Mazulina's gross monthly income payable monthly.

And a special assessment of $100 is mandatory and I impose that now.

I find that the sentence is sufficient but not greater than necessary to comply with the purposes of sentencing that I laid out.

Does the government have a motion with respect to any open counts or underlying charging instruments?

MR. SKURNIK: We do, your Honor. The government moves to dismiss Counts 2 through 12 of the indictment.

THE COURT: That motion is granted. Ms. Mazulina, you may appeal your conviction if you believe that your guilty plea was somehow unlawful or involuntary, or if there's some other fundamental defect in these proceedings that was not waived by your guilty plea or plea agreement. And under certain circumstances, a defendant also has a right to appeal her sentence.

Any notice of appeal must be filed within 14 days of the entry of judgment or within 14 days of the filing of a notice of appeal by the government, whichever comes later. And if requested, the clerk of the court will prepare and file a notice of appeal on your behalf. If you cannot afford to pay the cost of an appeal or for appellate counsel, you will have the right to apply for leave to appeal in forma pauperis which means you can

apply to have the Court waive the filing fee. On appeal you may also apply for court-appointed counsel.

The surrender date shall be October 23, 2026. And Ms. Mazulina, you will remain Your Honor liberty until then subject to the same conditions as were imposed on your pretrial bond.

From the government's perspective, any other matters to resolve in this case?

MR. SKURNIK: No, your Honor.

THE COURT: Probation?

PROBATION OFFICER: Your Honor, you imposed a 10 percent gross monthly income as the schedule of the fine?

THE COURT: Yes.

PROBATION OFFICER: That's on supervised release, right?

THE COURT: I'm sorry?

PROBATION OFFICER: That's for when she'd be on supervised release?

THE COURT: That's until the fine is paid. No?

PROBATION OFFICER: Okay.

THE COURT: Until the fine is paid in full I would think. And that's what I order absent any better suggestion from the parties.

PROBATION OFFICER: Thank you.

THE COURT: Thank you. All right. Ms. Gauli-Rufo, anything else from your side?

MS. GAULI-RUFO: Your Honor, would your Honor be inclined to recommend to the Bureau of Prisons that Ms. Mazulina serve her sentence at Alderson, Alderson in West Virginia?

THE COURT: Why? Is that the --

MS. GAULI-RUFO: She's done her research on the -- first of all, there's very few female prisons that will accommodate someone with her very little criminal history or none. I believe Alderson does offer FSA credits that she could get and she does not necessarily want to be visited by family members while she's there. She would like to serve her sentence and get it done and get on with her life, your Honor.

THE COURT: Okay. I will make that recommendation. Obviously, that's in the final analysis up to the Bureau of Prisons.

MS. GAULI-RUFO: Thank you.

THE COURT: But the judgment will so reflect that recommendation.

MS. GAULI-RUFO: Thank you.

THE COURT: All right. I will also respectfully request that the court reporter produce a transcript of today's proceeding pursuant to 28 U.S. Code

Section 753(b).

Ms. Mazulina, this sentence, assuming good time served, which I have every reason to assume will be the case, you will be released from the sentence in the relatively near future. The sentence, as you will have noted, is a meaningful discount from the bottom of the guidelines range. I imposed the discount because I believe that, and have every expectation, that you will resume the leading of a productive and law-abiding life upon release. I know you have meaningful contributions to make to your family, friends, and community, and I wish you the best of luck going forward.

Thank you, all. We will stand adjourned

MS. GAULI-RUFO: Thank you.

(Matter concluded)

-oOo-

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **23rd** day of **July**, 2026.

Mary Greco

Transcriptions Plus II, Inc.